## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MELANIE D.,[1]

      **Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

Case No. 3:24-CV-2499-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Melanie D. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on November 8, 2021, alleging a disability onset date of May 1, 2015. (Tr. 168-76.) Plaintiff claimed her anxiety, depression, agoraphobia, and back pain limited her ability to work. (Tr. 195.) Plaintiff's claim was denied initially on May 6, 2022 (Tr. 83), and upon reconsideration on September 9, 2022 (Tr. 89.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 18, 2023. (Tr. 43-62, 93-94). The ALJ found Plaintiff not disabled from

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

May 1, 2015, through December 31, 2020, Plaintiff's date last insured. (Tr. 11–24.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1).

Plaintiff now appeals the denial of DIB to this Court. She raises two issues: (1) whether the ALJ failed to properly evaluate her residual functional capacity ("RFC"); and (2) whether the ALJ failed to develop the record fully and fairly. (Doc. 16). The Commissioner filed a brief in opposition (Doc. 19), and Plaintiff filed a reply (Doc. 20).

### STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). Put another way, an ALJ's decision should be reversed only if the record "compels a contrary result." *Thorlton v. King*, 127 F.4th 1078, 1081 (7th Cir. 2025) (quoting *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021)).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the

Page 2 of 24

ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

Even when the ALJ commits error, a remand is not necessary if the error is harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Where the Court "look[s] at the evidence in the record" and can "predict with great confidence" that a remand to the ALJ would generate the same result, the error is deemed harmless. *Id.* In that situation, a remand "would be a waste of time and resources for both the Commissioner and the [Plaintiff]." *Id.*

### DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit.

20 C.F.R. § 404.1572.

"The administrative regulations set forth a five-step evaluation process to determine whether a claimant is disabled." *Pufahl v. Bisignano*, 142 F.4th 446, 452 (7th Cir. 2025). The ALJ sequentially considers whether:

1. the claimant is presently employed;

2. the claimant has a severe impairment or combination of impairments;

3. the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity;

4. the claimant's residual functional capacity leaves him unable to perform his past relevant work; and

5. the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*

"Between the third and fourth steps, the ALJ determines the claimant's residual functional capacity ('RFC'), *see* 20 C.F.R. § 404.1520(e), which is the claimant's maximum work capability." *Id.* The claimant has the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show the claimant's ability to perform other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is limited to the points raised by Plaintiff.

## I.   Relevant Medical Records

Plaintiff was 37 years old when she first presented to Dr. Jeffrey Chalfant, a board-certified Adult Psychiatrist, on January 27, 2015, complaining of symptoms of depression. (Tr. 275.) Plaintiff reported feeling sad, hopeless, worthless, lonely, and tired, as well as having low self-esteem, a loss of motivation, difficulty sleeping, decreased or increased appetite, a loss of interest in sex, worrying, and a loss of pleasure in life. (*Id.*) Plaintiff said she first had these symptoms in 2000 after the birth of her daughter and that the symptoms returned after the birth of her son in 2011. (*Id.*) Plaintiff reported a severe lack of motivation to do things like going to work. (*Id.*) She also said she felt anxious, worrisome, and panicky despite taking Celexa and lorazepam. (*Id.*) Dr. Chalfant diagnosed Plaintiff with anxiety and major depressive disorder, recurrent episode, severe, without psychotic behavior, and he prescribed Effexor in place of Celexa. (Tr. 277.)

Plaintiff returned for a follow-up appointment in March 2015 and reported that while she still had problems with energy and crying spells, she felt better on Effexor than on Celexa. (Tr. 279.) Dr. Chalfant increased her dosage of Effexor and directed Plaintiff to continue taking lorazepam as needed. (Tr. 281.)

In June 2015, Plaintiff told Dr. Chalfant that she had been having more problems with depression after her grandmother and cousin passed away. (Tr. 282.) She "missed some days at work and she lost her job." (*Id.*) Dr. Chalfant again increased Plaintiff's dosage of Effexor. (*Id.*) Over the next several months, Dr. Chalfant prescribed several different medications for Plaintiff, but Plaintiff continued to have problems with depression and a lack of motivation. (Tr. 290-300.) Dr. Chalfant switched Plaintiff back to

Effexor, and by February 2016, Plaintiff reported that her depression and mood were better, and her anxiety was "okay." (Tr. 300.) Plaintiff was still doing well in September 2016 (Tr. 303) and December 2016 (Tr. 306), although she began to have some sleep issues due to stress from the death of a friend. Dr. Chalfant encouraged her to try a regular sleep schedule and avoid sleeping during the day. (Tr. 308.)

Plaintiff began experiencing more anxiety and sleep problems in March 2017. (Tr. 309.) Dr. Chalfant increased her lorazepam dosage and again encouraged her to get on a regular sleeping schedule. (Tr. 311.) Plaintiff returned the next month and reported waking up screaming at night ever since her dosage of lorazepam had increased. (Tr. 312.) She also would not leave the house unless her parents went with her. (*Id.*) Dr. Chalfant discontinued the lorazepam, prescribed clonazepam, and encouraged Plaintiff to see her counselor. (Tr. 314.)

After beginning clonazepam, Plaintiff reported doing much better and sleeping at night. (Tr. 315-20.) She also felt more active and was doing more things with her children. (*Id.*) She did not report any problems with depression or anxiety. (*Id.*) In December 2017, she reported occasionally having problems with sleeping at night, so she would sleep during the day. (Tr. 321). This was the last time Plaintiff saw Dr. Chalfant due to insurance issues. (*See* Tr. 740.)

Plaintiff saw providers off and on for her anxiety and depression between December 2017 and December 31, 2020, Plaintiff's date last insured. In March 2018, Plaintiff told Carrie Parent, PA, a provider at Southern Illinois Healthcare Foundation, that the Effexor and clonazepam were still working fine. (Tr. 463.) However, she also

reported trouble falling asleep or waking up in the night and being unable to go back to sleep. (*Id.*). Plaintiff's prescription for Effexor was continued, and she was directed to take melatonin before bedtime as needed. (*Id.*) In November 2018, Plaintiff reported that another doctor stopped her prescription for clonazepam and started citalopram. (Tr. 454). That week, she had a panic attack in the middle of the night. (*Id.*) Once clonazepam was restarted, she was feeling fine with no more panic attacks. (*Id.*)

In June 2019, Plaintiff reported that her symptoms had improved, but that her anxiety still interfered with her sleep. (Tr. 441.) Yet, she did not request any changes to her prescriptions, as she felt the current regimen was good for her anxiety. (*Id.*) In July 2020, Plaintiff reported that she had been sleeping more than usual and was experiencing symptoms of anxiety including irritability, hostility, occasional despair/hopelessness, trembling or shaking, and headaches. (Tr. 488.) She noted, however, that she had only been taking the clonazepam every other day. (Tr. 489.)

There are also a number of treatment records related to Plaintiff's mental health and lower back pain that post-date Plaintiff's date last insured. (Tr. 731-842.) Plaintiff began seeing a therapist, Cynthia Riewski, LCSW, on May 11, 2021. (Tr. 740). The therapist noted that Plaintiff was referred to her by Carrie Parent, PA, who had been treating Plaintiff for depression and anxiety with Effexor and clonazepam. (*Id.*) Plaintiff told Ms. Riewski that her depression and anxiety started getting really bad around 2011 and that she had been unable to work since 2015 due to her anxiety and panic attacks. (*Id.*) Plaintiff reported either being up all night or sleeping all the time, as "sleep is her escape." (*Id.*) Plaintiff denied any child abuse growing up but admitted that she had been

in two abusive relationships, including one from 2003 to 2009 with a man who kept her locked in the basement. (*Id.*) Ms. Riewski assessed Plaintiff as having major depressive disorder, generalized anxiety disorder, agoraphobia with panic disorder, and posttraumatic stress disorder. (Tr. 741.)

Related to these proceedings, Ms. Riewski provided an opinion statement dated December 15, 2021, regarding Plaintiff's mental limitations. (Tr. 844.) Ms. Riewski stated that Plaintiff's abilities to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stress, and function independently were "poor or none," and her abilities to use judgment and maintain attention and concentration were fair. (Tr. 845.) Ms. Riewski also stated that Plaintiff's ability to remember and carry out complex instructions was compromised due to her inability to focus, but that Plaintiff's ability to understand, remember, and carry out simple job instructions was fair. (Tr. 846.) While Plaintiff could maintain her personal appearance, she had poor to no ability to behave in an emotionally stable manner, relate predictably, or demonstrate reliability, indicating that she becomes panicky in social situations or when having to interact with others. (Tr. 847.) Ms. Riewski also found that Plaintiff would miss two or more days of work per month or arrive late two or more times per month due to her psychological condition. (*Id.*) She estimated Plaintiff would be off task 80% of the time in any given eight-hour period. (Tr. 848.) Ms. Riewski stated that these limitations commenced in 2011 and could be expected to continue permanently. (*Id.*) On August 29, 2022, Cheryl Pritchard-Palmer, FNP, provided a statement agreeing with and adopting Ms. Riewski's opinion statement. (Tr. 629.)

## II.    State Agency Examiners

In response to Plaintiff's initial DIB application, a State Agency Disability Determination was conducted. (Tr. 64-68.) Dr. Michael Schneider found there were no mental medically determinable impairments established because there were no records pertaining to the relevant time period. (Tr. 66.) The earliest record available to Dr. Schneider was from May 2021, which was after the date last insured. (*Id.*) He did note that Plaintiff's mother submitted a Third-Party Function Report, which stated Plaintiff had erratic sleep, did not socialize, had mood swings, did not want to go outside, and could go out alone but preferred to be with someone. (*Id.*). Dr. Schneider found this was insufficient to establish a medically determinable impairment prior to the date last insured. (*Id.*)

On reconsideration, Dr. Jeanne Yakin noted that some medical records came in after the initial decision from Dr. Chalfant. (Tr. 73.) Dr. Yakin briefly summarized Dr. Chalfant's records before stating that the evidence was insufficient to establish a medically determinable impairment prior to the date last insured. (Tr. 73-74.)

## III.    Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing before the ALJ on May 18, 2023. (Tr. 46). A vocational expert ("VE") also appeared by telephone. (*Id.*)

Plaintiff testified that she lives with her parents and her 12-year-old son. (Tr. 50.) She does not drive due to her panic attacks and anxiety, so she let her driver's license expire. (*Id.*) However, she is involved with her son's schooling, including attending

Page 9 of 24

parent-teacher conferences and open houses—although she has had to miss or reschedule a conference because of her medical condition. (Tr. 51.)

Plaintiff testified that she worked at Walmart for 18 years before she was fired on May 1, 2015, for missing too much work. (Tr. 51-52.) As a sales associate at Walmart, Plaintiff answered the phone and worked in the fitting room area. (Tr. 52.) She kept the fitting rooms clean and hung up clothes. (Tr. 53.) In 2011, she began missing days of work due to her psychological condition, namely, her sleeping pattern. (Tr. 54-55.) Plaintiff testified that she would go up to 24 hours without sleep due to anxiety, then she would sleep for two days. (Tr. 55, 56.)

Regarding medications, Plaintiff testified that she takes lorazepam when she is feeling panicky, about three times per week. (Tr. 56-57.) It was prescribed for her depression, anxiety and panic disorder, PTSD, and agoraphobia. (Tr. 57). Plaintiff did not report any side effects from taking the medication. (Tr. 56.)

Plaintiff also testified that she has prediabetes, and that her symptoms are fatigue and going to the bathroom every hour. (Tr. 58.)

The ALJ then asked the VE to consider a hypothetical involving a person of Plaintiff's age, education, and work experience without any exertional limitations. (Tr. 59.) The VE was asked if there are jobs this hypothetical person could do, presuming the individual is able to learn, remember, and carry out simple, routine tasks, able to use reason and judgment to make simple, routine work-related decisions, and able to work at an appropriate and consistent pace while performing simple, routine tasks in a timely manner, but the person must have only gradual changes in job setting and duties, work

with the same types of things (not people) on a day-to-day basis, and have only occasional contact with coworkers and supervisors. (Tr. 59-60.) The VE testified that this individual could work as a laundry worker II, hand packager, or cleaner II. (Tr. 60.) However, the VE testified that competitive employment would be ruled out if the hypothetical individual were late to work two or more days per month. (Tr. 61.)

### DECISION OF THE ALJ

In reaching his decision, the ALJ considered the entire record.

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of May 1, 2015, through her date last insured of December 31, 2020. (Tr. 13.)

At step two, the ALJ concluded that Plaintiff had the following severe impairments: major depressive disorder and anxiety disorder. (*Id.*) The ALJ noted that these medically determinable impairments significantly limited Plaintiff's ability to perform basic work activities. (*Id.*) The ALJ observed that Plaintiff's exams showed her as overweight or even obese based on her BMI, but there was no evidence that this had any impact on her pulmonary, musculoskeletal, endocrine, or cardiac functioning. (Tr. 14.) Therefore, Plaintiff's obesity was not a severe impairment. (*Id.*)

Plaintiff also alleged in her Disability Report that she suffered from back pain, but the ALJ found no evidence in the record of imaging, testing, or objective observations, prior to the date last insured, that would support any medically determinable impairment related to her spine or back. (*Id.*) Finally, although Plaintiff testified she was prediabetic at the hearing, there was nothing in the record to support a diagnosis of

diabetes or prediabetes, and thus no evidence supporting a medically determinable impairment that would more than minimally impact the ability to perform work. (*Id.*)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the SSA regulations. (*Id.*) The ALJ found Plaintiff had a moderate limitation with regard to (1) remembering or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. (Tr. 14-15).

With regard to remembering or applying information, the ALJ noted that Plaintiff denied any significant issues with her memory or needing reminders for medications or appointments. (Tr. 15.) Additionally, Plaintiff was able to understand and participate in her own care and treatment, prepare simple meals, do basic household chores, provide care and supervision for her minor child, attend parent-teacher conferences, handle finances, and manage her own medical decisions. (*Id.*)

As to interacting with others, Plaintiff alleged that she did not like leaving the house, she did not like interacting with others outside of her family, and she lost her job, which required a lot of public interaction, due to missing work. (*Id.*) Plaintiff's mental status exams showed that she had reported some instances of poor mood, feeling depressed or anxious at times, and appearing with constricted or tearful affect, but there was no indication that her behavior was aggressive, combative, or otherwise inappropriate. (*Id.*) On the other hand, Plaintiff did not have thoughts of self-harm, she was able to attend appointments, and she traveled to Florida with her daughter to see her

daughter's father, which suggested she was able to interact with others, at least in a limited capacity. (*Id.*) Overall, while Plaintiff had some limitations in this area, she did not present evidence that she was seriously limited in her ability to function independently, appropriately, or effectively, and on a sustained basis, as would be necessary to support a marked limitation.

With regard to concentrating, persisting or maintaining pace, the ALJ observed that Plaintiff and her mother both indicated it was dependent on the task. (Tr. 16.) For example, her mother indicated Plaintiff could spend most of her day watching television or playing games on her phone, yet she needed help finishing paperwork. Plaintiff was also able to do basic household chores, care for her child and pets, and her mental status exams showed logical and organized thought processes. (*Id.*) She also generally presented with normal speech, and there was no evidence of any psychomotor abnormalities that would suggest any significant deficits in her attention, focus, or concentration as to simple types of tasks and activities. (*Id.*)

Finally, as to adapting or managing oneself, the ALJ noted that while Plaintiff reported depressive and anxiety symptoms that were somewhat persistent, they were fairly stable and generally improved with regular monitoring and medications without the need for hospitalization or higher-level psychiatric care. (*Id.*) Furthermore, although Plaintiff reported a fear of leaving her home, it appeared she had been able to do so on at least a limited basis. (*Id.*) Therefore, the evidence was consistent with a moderate limitation in this area. (*Id.*)

Because Plaintiff's mental impairments did not cause at least one "extreme"

limitation or two "marked" limitations, the "paragraph B" criteria were not satisfied. (*Id.*) The ALJ then considered whether the "paragraph C" criteria were satisfied and determined that the evidence failed to establish the presence of such criteria. (*Id.*)

Upon considering the entire record, the ALJ then determined Plaintiff's RFC between May 1, 2015, and December 31, 2020. (Tr. 16-17.) He found that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> She was able to learn, remember, and carry out simple, routine tasks; was able to use reason and judgment to make simple, routine work-related decisions; was able to work at an appropriate and consistent pace while performing simple, routine tasks; and was able to complete simple, routine tasks in a timely manner. However, [she] would have been limited to only gradual changes in job setting and duties; work with same types [of] things on a day to day basis, rather than people; could have had occasional contact with coworkers but no tandem tasks; and had occasional contact with supervisors. (*Id.*)

In coming to this conclusion, the ALJ considered Plaintiff's subjective symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence. With regard to the subjective evidence, the ALJ considered Plaintiff's testimony that her anxiety and depression limited her ability to regulate her sleep and mood, to interact with others outside of her immediate household, and to leave her home. (Tr. 17.) She also did not drive and had a fear of leaving the house. (*Id.*) The ALJ additionally considered Plaintiff's mother's Third-Party Function Report in which she noted Plaintiff's erratic sleep patterns, mood swings, and dislike of socializing and leaving the house. (Tr. 18.) Plaintiff's mother indicated that although Plaintiff did laundry and dishes, she spent most of the day watching videos on her phone. (*Id.*)

The ALJ then concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the objective medical evidence and other evidence in the record. (*Id.*) He found that treatment records showed Plaintiff's symptoms waxed and waned to some degree but were overall fairly well controlled. (*Id.*) In June 2015, shortly after the alleged onset date of May 15, 2015, Plaintiff's dosage of Effexor was increased after she reported that she was more depressed and had just lost her job due to missing work. (Tr. 19.) In February 2016 and September 2016, Plaintiff stated that she was doing well on Effexor. (*Id.*) While Plaintiff "hit a rough patch" in March 2017, she was eventually prescribed clonazepam and reported doing much better. (*Id.*) She did report some issues with sleeping, although she admitted she was sleeping during the day and staying up all night. (*Id.*) In March 2018, Plaintiff reported that she was taking Effexor and clonazepam, which she had been taking regularly for a couple years without changes, and felt like they were working fine, although sleeping remained a problem. (*Id.*) In sum, Plaintiff's medical records showed that her symptoms of anxiety and depression were largely controlled with medication, and—absent a few adjustments early on in her treatment—her medication regimen was fairly stable. (Tr. 20).

Moreover, Plaintiff's mental status exams generally showed that she had a logical and organized thought process, normal speech, and no evidence of psychomotor abnormalities that would suggest any significant deficits in her attention, focus or concentration as to simple types of tasks and activities. (*Id.*) Thus, the evidence supported a finding that Plaintiff was able to perform simple, routine tasks in a timely manner. (*Id.*)

As to Plaintiff's allegations that she had difficulty getting to work because of sleep issues that caused her to be up all night and then sleep for days at a time, the ALJ found this also was not supported by objective evidence. (*Id.*) When she reported sleeping problems to her psychiatric provider, he directed her to watch her sleep habits, which she did not always do. (*Id.*) When she saw another provider for her sleep issues, the only recommendation was to take melatonin. (*Id.*) Overall, the ALJ noted, there was a lack of evidence to support the severity of Plaintiff's alleged sleep problems. Furthermore, the limitations in the RFC (simple, routine tasks and limited exposure to changes) would account for any minimal limitations caused by Plaintiff's sleep issues. (*Id.*)

The ALJ gave no controlling weight to the prior administrative medical findings of Dr. Schneider or Dr. Yakin, the psychological consultants for the administrative agency at the initial and reconsideration levels. (Tr. 21.) The ALJ noted that these doctors did not provide any findings regarding the RFC because there was insufficient evidence prior to the date last insured. (*Id.*) To the contrary, the ALJ stated, there was ample evidence of Plaintiff's allegations of disability and objective medical evidence, which was available to the psychological consultants at the time of their reviews. (*Id.*) Thus, Dr. Schneider and Dr. Yakin's findings were neither supported by nor consistent with the treatment records and were not persuasive. (*Id.*)

The opinions of Cynthia Riewski, LCSW, regarding Plaintiff's mental limitations also were not persuasive to the ALJ, as they were provided on December 15, 2021, well after the date last insured. (Tr. 21-22.) Furthermore, her treatment records were from 2021 and 2022, so they did not support Ms. Riewski's opinions regarding Plaintiff's

functioning between May 15, 2015, and December 31, 2020. (*Id.*) Although Ms. Riewski indicated that Plaintiff's limitations began in 2011, the ALJ noted that she provided no explanation in her opinion statement for this date. Even if Ms. Riewski's opinions applied to the period at issue, the ALJ found they were not consistent with the evidence and treatment records and, therefore, were not persuasive. (*Id.*) Likewise, the statement of Cheryl Pritchard-Palmer, FNP, agreeing with Ms. Riewski, was not persuasive as she merely adopted Ms. Riewski's opinions. (Tr. 22.)

Given the assessed RFC, at step four the ALJ found that Plaintiff was unable to perform her past relevant work as a sales attendant. (*Id.*) The ALJ relied on the VE's testimony that the demands of Plaintiff's past work—particularly with regard to interacting with the public—exceeded her RFC. (*Id.*)

At step five, the ALJ concluded that based on Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that Plaintiff could have performed—including laundry worker II, hand packager, and cleaner II. (Tr. 22-23).

For these reasons, the ALJ found that Plaintiff was "not disabled" at any time from May 1, 2015, the alleged onset date, through December 31, 2020, the date last insured. (Tr. 23).

## DISCUSSION

### I.    Whether the ALJ failed to develop the record fully and fairly.

The Court addresses Plaintiff's second point first, as whether the record was fully and fairly developed impacts whether the ALJ properly evaluated Plaintiff's RFC.

Plaintiff argues that the record does not contain any medical evidence that addresses her ability to function in the workplace that supports the RFC assessment. Plaintiff notes that ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves. Yet, Defendant's medical consultants, Dr. Schneider and Dr. Yakin, said there was insufficient evidence prior to the date last insured to evaluate Plaintiff's claim. Instead of obtaining a medical opinion to evaluate how Plaintiff's anxiety and depression impacted her RFC, she argues, the ALJ determined the significance of that evidence himself. In doing so, Plaintiff contends that the ALJ was impermissibly "playing doctor" and interpreting medical evidence. And without evidence from a medical expert, she argues that the ALJ's RFC assessment is not supported by the record.

While acknowledging that an ALJ has some responsibility to ensure the record is fully and fairly developed, the Commissioner asserts that this obligation "is not limitless," especially when a plaintiff is represented by an attorney throughout the administrative proceedings. Moreover, it is Plaintiff's burden to prove she was disabled before the ALJ. *Thorlton*, 127 F.4th at 1080–81 (citing *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity.")).

While it is true that a claimant bears the burden of proving disability, the ALJ has a duty to develop a full and fair record, even when the claimant is represented by counsel. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). "[T]he ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations,

Page 18 of 24

and contacting treating physicians and medical sources to request additional records and information." *Id.* However, "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Id.* (citation omitted). "Instead a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider." *Id.*

Here, Plaintiff argues that both state agency medical consultants, Dr. Schneider and Dr. Yakin, found insufficient evidence to evaluate her claim. Then, instead of obtaining a medical opinion to evaluate how Plaintiff's signs and symptoms from depression and anxiety affected her RFC as of December 31, 2020, the ALJ played doctor and determined the significance of the evidence himself.

The record does not support Plaintiff's claim. At the initial decision level, Dr. Schneider noted that Dr. Chalfant had been treating plaintiff for years, but he failed to respond to requests for records. Without those records, Plaintiff's diagnosis and treatment history prior to the date last insured could not be determined. (Tr. 66). But, by the time Dr. Yakin reviewed the case at the reconsideration level, Dr. Chalfant's records *were* available. Dr. Yakin considered Dr. Chalfant's records, noting that during Plaintiff's visits, her speech was within normal limits, her thought process was logical, and her mood and affect were either good or mostly euthymic. (Tr. 73.) She also noted Plaintiff's diagnoses of anxiety and major depressive disorder but then found that the evidence was insufficient for a finding of disability prior to the date last insured—*not* that the evidence was insufficient to make a finding whatsoever. (*Id.*)

Moreover, "the determination of a claimant's RFC is a matter for the ALJ alone—

not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). Here, the record is replete with medical records and evidence from Plaintiff's treating physicians both during the relevant time period and after her date last insured from which the ALJ could determine Plaintiff's RFC. The ALJ thoroughly discussed Dr. Chalfant's records and Plaintiff's subsequent records from Southern Illinois Healthcare Foundation. He also considered the opinions of Ms. Riewski, Plaintiff's therapist, regarding Plaintiff's mental limitations. The ALJ ultimately found Ms. Riewski's opinions unpersuasive because they were outside the relevant time period and because Ms. Riewski did not fully support her opinion that Plaintiff's limitations began in 2011. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (the weight an ALJ affords a treating physician's opinion depends on factors including whether the physician supported his or her opinions with sufficient explanations). But a finding that certain evidence is unpersuasive does not mean the ALJ failed to fully and fairly develop the record. The Court declines to remand to the Commissioner on this basis.

II.     **Whether the ALJ failed to properly evaluate Plaintiff's RFC.**

The RFC is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). When assessing the RFC, an ALJ must incorporate all of a claimant's functional limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *see also Moy v. Bisignano*, 142 F.4th 546, 552 (7th Cir. 2025). "[T]he ALJ must ensure the VE is 'apprised fully of the claimant's

Page 20 of 24

limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Id.* (quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)).

The Seventh Circuit has emphasized that an ALJ, in crafting the RFC, cannot rely on "catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." *Id.* "More to it, observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Id.*

Here, Plaintiff argues that the ALJ did not account for her moderate limitation in concentrating, persisting, or maintaining pace in his RFC assessment, and, thus, did not account for the totality of her limitations. Plaintiff contends that the evidence shows she would be late to work or miss work at least one day per month, and she would be off task more than 15% of the workday because of her issues with sleep, social isolation, and low motivation. Thus, per the VE's testimony about employers' expectations, she would be unable to maintain competitive employment. Because the ALJ's RFC assessment provided no accommodation for a moderate limitation in concentration, persistence, or pace, Plaintiff argues, it did not incorporate all of the limitations supported by the record.

In response, the Commissioner notes that Plaintiff's argument is premised on cases where the ALJ applied outdated regulations that did not define the term "moderate." Here, however, the ALJ applied the regulations as amended in 2017. Under the new regulations, the term "moderate limitation" means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R.,

pt. 404, subpt. P, app. 1 § 12.00(F)(2). In *Pavlicek v. Saul*, the Seventh Circuit referenced the amended regulation and agreed with the Commissioner there that "fair" in ordinary usage does not mean "bad" or "inadequate." *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). "So, a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." *Id.*

In her reply brief, Plaintiff relies on *Moy v. Bisignano*, 142 F.4th 546, 552 (7th Cir. 2025), for the proposition that, even under the new regulations, the RFC assessment must still account for a moderate limitation in concentration, persistence, or pace. In *Moy*, the plaintiff suffered from severe PTSD related to her experience in concentration camps in Bosnia during the conflicts that tore Yugoslavia apart in the early 1990s. *Id.* at 549. The plaintiff continually had flashbacks of children screaming and her father's head being cut off, and she was unable "to even see people in the street without having emotional outburst, anger, and physical pain." *Id.* at 550.

In assessing the plaintiff's RFC in that case, the ALJ found that the plaintiff had "moderate limitations in concentrating, persisting, or maintaining pace." *Id.* at 549. He then wrote that, to "account for moderate limitations in concentrating, persisting or maintaining pace, I provided that she *can* work at a consistent production pace." *Id.* The Seventh Circuit saw this "as a non-sequitur: to accommodate Moy's moderate limitations, the ALJ treated her as if she were unlimited in those respects." *Id.* In reversing and remanding the case to the Commissioner for further consideration, the court explained:

> The ALJ found that Moy had limitations in her ability to concentrate, persist, and maintain pace, noting that Moy alleged "difficulty focusing," reported "flashbacks and hallucinations," and demonstrated "distractible

Page 22 of 24

attention during psychotherapy visits." Perhaps the ALJ might have concluded that, despite these limitations, Moy could nonetheless stay on-task and regularly attend work in a way that would not interfere with her employment. But that was not his reasoning. Instead, "to account" for Moy's limitations, the ALJ concluded that she could work at a "consistent production pace"—which we understand to say that, to account for Moy's limitations, he imposed no additional restrictions. This reasoning fails to build a logical bridge between the limitations found and the residual functional capacity conclusion.

*Id.* at 553.

Unlike *Moy*, the ALJ in this case accounted for Plaintiff's moderate limitation with regard to concentrating, persisting, and maintaining pace by imposing specific restrictions. (Tr. 14.) He found that Plaintiff was able to work at an *appropriate* and consistent pace while performing simple, routine tasks, and she was able to complete *simple, routine tasks in a timely manner. See Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) ("The law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work."). He also found that Plaintiff could only have "gradual changes in job setting and duties," could only work with the same types of things (not people) on a day-to-day basis, could have no more than occasional interaction with coworkers and supervisors, and could not engage in tandem tasks. (Tr. 14.) When taken as a whole, the Court finds that the ALJ's RFC assessment adequately accounts for Plaintiff's moderate limitations in concentrating, persisting, and maintaining pace.

Finally, to the extent Plaintiff asserts she would be late to work or miss work at least one day per month, and she would be off task more than 15% of the workday because of her issues with sleep, social isolation, and low motivation, her argument is

largely based on the opinions of Dr. Riewski. But the ALJ did not find Dr. Riewski's opinion persuasive, and this Court may not reweigh the evidence. *Gedatus*, 994 F.3d at 900.

Because the ALJ's RFC assessment is supported by substantial evidence, the Court affirms the ALJ's decision.

CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment in favor of the Commissioner of Social Security.

**IT IS SO ORDERED.**

**DATED:   March 25, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**